FILED
2021 Dec-23  PM 12:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| CYNTHIA GRUELLE | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| | ) | |
| AMERICAN MEDICAL SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | **COMPLAINT AND JURY DEMAND** |
| | ) | |
| | ) | |
| | ) | |

COMES NOW Plaintiff, CYNTHIA GRUELLE ("Plaintiff"), by and through her attorneys of record, MOLL LAW GROUP, and files this complaint against Defendant, AMERICAN MEDICAL SYSTEMS, INC., (hereinafter referred to as "AMS" or "Defendant"), as follows:

### PARTIES, JURISDICTION & VENUE

1.      This action seeks to recover damages for the injuries sustained by Plaintiff as the direct and proximate result of the wrongful conduct and negligence of the defendant in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distributing, labeling, and selling of the Sparc Sling System Mesh device (herein after also referred to as the "Mesh Product") manufactured by Defendant American Medical Systems, Inc., implanted in Plaintiff.

2.      Plaintiff is, and was at all times relevant hereto, a citizen of the state of Alabama, County of Winston.

3.      Defendant American Medical Systems, Inc. ("AMS") is a Delaware corporation with its corporate headquarters and principal place of business located at 10700 Bren Road West, Minnetonka, Minnesota 55343.

4.      At all times material to this action, Defendant has designed, patented, manufactured, labeled, marketed, and sold and distributed a line of pelvic mesh products, including the Mesh Product implanted in Plaintiff. These products were designed primarily for the purposes of treating stress urinary incontinence and pelvic organ prolapse. These products share common design elements and common defects. Moreover, each of these products, including the Mesh Product implanted in Plaintiff, was cleared for sale in the U.S. after the Defendants made assertions to the Food and Drug Administration of "Substantial Equivalence" under Section 510(k) of the Food, Drug and Cosmetic Act; this clearance process does not require the applicant to prove safety or efficacy.

5.      At all times relevant here to, Defendant designed, manufactured, packaged, labeled, marketed, sold, and distributed the Mesh Product, which was implanted in Plaintiff.

## JURISDICTION AND VENUE

6.      Federal subject matter jurisdiction in this action is based upon 28 U.S.C. § 1332(a), in that there is complete diversity among Plaintiff and Defendant and the amount in controversy exceeds $75,000.

7.      Defendant has significant contacts with this District such that they are subject to the personal jurisdiction of this Court.

8.      A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in this District. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said district.

## FACTUAL BACKGROUND

9.      Defendant's pelvic mesh products, including the Mesh Product implanted in Plaintiff, contain monofilament polypropylene mesh. Despite claims that polypropylene is inert, the scientific evidence shows that this material as implanted in Plaintiff is biologically

incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the mesh products. This negative response promotes inflammation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh.

10.     Defendant sought and obtained FDA clearance to market the Mesh Product under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act. Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted with regard to the Mesh Product.

11.     On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that "serious complications associated with surgical mesh for transvaginal repair of POP are **not rare**" (emphasis in the original).

12.     The FDA Safety Communication also stated, "*Mesh contraction* (shrinkage) is a previously unidentified risk of transvaginal POP repair with mesh that has been reported in the published scientific literature and in adverse event reports to the FDA. Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain." (emphasis in original).

13.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists (ACOG) and the American Urogynecologic Society (AUGS) also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating: There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections

of mesh . . . Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.

14.     The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

15.     Plaintiff's type of injuries are reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion.

16.     The FDA Safety Communication further indicated that the benefits of using transvaginal mesh products instead of other practical alternatives did not outweigh the associated risks. Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk."

17.     Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the White Paper). In the White Paper, the FDA noted that the published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

18.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk." (emphasis in original).

19.     The FDA White Paper further stated that "these products are associated with serious adverse events . . . compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair."

20.     In its White Paper, the FDA advises doctors to, inter alia, "[r]ecognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications." The FDA concludes its White Paper by stating that it "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

21.     As is known to the Defendant, the risks associated with POP repair are the same as SUI repair. However, the data regarding the magnitude and frequency of these known risks are not as developed as the data on POP repair. The FDA recognized this, as demonstrated by its Section 522 Orders issues to manufacturers of pelvic mesh products used to treat SUI in January of 2012.

22.     In September 2011, the FDA acknowledged the need for additional data and noted in "Surgical Mesh For Treatment of Women with Pelvic Organ Prolapse and Stress Urinary Incontinence" that the literature and information developing on SUI repair with mesh "indicates that serious complications can occur . . . [and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh products used for SUI."

23.     Defendant did not, and has not, adequately studied the extent of the risks associated with the Mesh Product. In January 2012, the FDA recognized the risk to women and mandated additional studies to further investigate these risks.

24.     Defendant knew or should have known about the Mesh Product's risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

25.     Defendants knew or should have known that the Mesh Product unreasonably exposed patients, including Plaintiff, to the risk of serious harm while conferring no benefit over available, practical, and safer alternatives that do not involve the same risks.

26.     The scientific evidence shows that the material from which the Mesh Product is made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the Mesh Product, including Plaintiff.

27.     The Mesh Product implanted in Plaintiff did not incorporate the best technology available, safest, and practical at the time it was manufactured.

28.     This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Plaintiff.

29.     The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Mesh Product was unreasonably susceptible to degradation and fragmentation inside the body.

30.     The Mesh Product was unreasonably susceptible to shrinkage and contraction inside the body. Defendant should have known of this serious risk and warned physicians and patients.

31.     The Mesh Product was unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

32.     At all times relevant hereto, the Mesh Product was marketed to the medical community and to patients, including Plaintiff, as a safe, effective, reliable, medical device,

implanted by safe and effective, minimally invasive surgical techniques, and as safer and more effective as compared to available practical alternative treatments of stress urinary incontinence, and other competing products.

33.     Defendant omitted and downplayed the risks, dangers, defects, and disadvantages of the Mesh Product, and advertised, promoted, marketed, sold and distributed the Mesh Product as a safe medical devices when Defendants knew or should have known that the Mesh Product was not safe for its intended purposes, and that the Mesh Product would cause, and did cause, serious medical problems, and in some patients, including Plaintiff, catastrophic injuries.

34.     Contrary to Defendant's representations and marketing to the medical community and to the patients themselves, the Mesh Product has high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making them defective under the law.

35.     The specific nature of the Mesh Product's defects includes, but is not limited to, the following:

a.      The use of polypropylene in the Mesh Product and the immune reactions that result from such material, causing adverse reactions and injuries;

b.      The design of the Mesh Product to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.      Biomechanical issues with the design of the Mesh Product, including, but not limited to, the propensity of the Mesh Product to contract or shrink inside the body,

that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d.     The use and design of arms and anchors in the Mesh Product, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

e.     The propensity of the Mesh Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f.     The inelasticity of the Mesh Product, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking);

g.     The propensity of the Mesh Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h.     The hyper-inflammatory responses to polypropylene leading to problems including chronic pain and fibrotic reaction;

i.     The adverse tissue reactions caused by the Mesh Product, which are causally related to infection, as the mesh is a foreign organic material to the human body

j.     The harshness of polypropylene upon the female pelvic tissue, and the hardening of the Mesh Product in the body; and

k.     The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturers' instructions.

l.     The procedure itself, which is part of Defendant's Pelvic Mesh Products, requires the physician to insert the device "blindly" resulting in nerve damage and damage to other internal organs; and

m.    the design of trocars, as devices which as part of Defendant's Pelvic Mesh Products and which are used to insert the Pelvic Mesh Products into the vagina, are defective because the device requires tissue penetration in nerve rich environments which results frequently in the destruction of nerve endings causing pain and other injuries.

36.    The Mesh Product is also defective due to Defendant's failure to adequately warn or instruct Plaintiff and/or her implanting physician of subjects including, but not limited to, the following:

a.    The Mesh Product's propensities to contract, retract, and/or shrink inside the body;

b.    The Mesh Product's propensities for degradation, fragmentation and/or creep;

c.    The Mesh Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.    The frequency and manner of mesh erosion or extrusion;

e.    The risk of chronic inflammation resulting from the Mesh Product;

f.    The risk of chronic infections resulting from the Mesh Product;

g.    The risk of permanent vaginal or pelvic scarring as a result of the Mesh Product;

h.    The risk of recurrent, intractable pelvic pain and other pain resulting from the Mesh Product;

i.    The need for corrective or revision surgery to adjust or remove the Mesh Product;

j.  The severity of complications that could arise as a result of implantation of the Mesh Product;

k.  The hazards associated with the Mesh Product;

l.  The Mesh Product's defects described herein;

m.  Treatment of pelvic organ prolapse and stress urinary incontinence with the Mesh Product is no more effective than practical, safer, available alternatives;

n.  Treatment of pelvic organ prolapse and stress urinary incontinence with the Mesh Product exposes patients to greater risk than practical, safer, available alternatives;

o.  Treatment of pelvic organ prolapse and stress urinary incontinence with the Mesh Product makes future surgical repair more difficult than practical, safer, available alternatives;

p.  Use of the Mesh Product puts the patient at greater risk of requiring additional surgery than practical, safer, available alternatives;

q.  Removal of the Mesh Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.  Complete removal of the Mesh Product may not be possible and may not result in complete resolution of the complications, including pain.

37.  Defendant underreported and continues to underreport information about the propensity of the Mesh Product to fail and cause injury and complications, and have made unfounded representations regarding the efficacy and safety of the Mesh Product through various means and media.

38.     Defendant failed to perform proper and adequate testing and research in order to determine and evaluate the nature, magnitude and frequency of the risks attendant to the Mesh Product.

39.     Defendant failed to design and establish a safe, effective procedure for removal of the Mesh Product, or to determine if a safe, effective procedure for removal of the Mesh Product exists.

40.     Safer, practical and suitable alternatives to the Mesh Product have existed at all times relevant that do not present the same frequency or severity of risks as does the Mesh Product. These safer, practical, and suitable alternatives include but are not limited to:

    a.  The use of sutures, including delayed absorbable sutures like PDS, in colposuspension procedures like the Burch;

    b.  Autologous facia slings;

    c.  An allograft sling such as Repliform;

    d.  A sling with less polypropylene material such as Ultrapro; and

    e.  Corrective surgery without the use of mesh.

41.     The Mesh Product was at all times utilized and implanted in a manner foreseeable to Defendant, as Defendant generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician.

42.     Defendant provided incomplete and insufficient training and information to physicians, including Plaintiff's implanting physician, regarding the use of the Mesh Product and the aftercare of patients implanted with the Mesh Product.

43.     The Mesh Product implanted in Plaintiff was in the same or substantially similar condition as it was when it left Defendant's possession, and in the condition directed by and expected by Defendants.

44.     The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Mesh Products include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and chronic pelvic pain.

45.     In many cases, including Plaintiff's, women have been forced to undergo extensive medical treatment including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

46.     The medical and scientific literature studying the effects of the Mesh Product has examined each of these injuries, conditions, and complications, and has reported that they are causally related to the Mesh Product.

47.     Removal of contracted, eroded and/or infected mesh can require multiple surgical interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and muscles.

48.     At all relevant times herein, Defendant continued to promote the Mesh Product as safe and effective even when no clinical trials had been done supporting long- or short-term efficacy or safety.

49.     In doing so, Defendant failed to disclose to Plaintiff, Plaintiff's implanting physician, and the medical community, the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Mesh Product, including the magnitude and frequency of these risks.

50.     At all relevant times herein, Defendant failed to provide sufficient warnings and instructions that would have put Plaintiff, Plaintiff's implanting physician, and the medical community on notice of the dangers and adverse effects caused by implantation of the Mesh Product.

51.     The Mesh Product as designed, manufactured, distributed, sold and/or supplied by Defendant was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendant's knowledge of lack of safety.

52.     On or about January 25, 2015, Plaintiff had the Mesh Product implanted at DCH Regional Medical Center, Tuscaloosa, Alabama, by her implanting physician to treat her urinary stress incontinence.

53.     Thereafter, Plaintiff began experiencing painful and serious complications, including but not limited to: constant, excruciating abdominal and pelvic pain; mesh erosion and exposure.

54.     On or about July 15, 2021, Plaintiff underwent a procedure at UAB Hospital in Birmingham, Alabama for removal of Defendant's Mesh Product.

55.     As a result of having the Mesh Product implanted in her, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered

financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

**Fraudulent Concealment**

56.     The running of any statute of limitations has been tolled by reason of Defendant's fraudulent concealment. Defendant through affirmative misrepresentations and omissions, actively concealed from Plaintiff and Plaintiff's implanting physician, the medical community, and the general public the true risks associated with the Defendant's Mesh Products.

57.     As a result of Defendant's actions, Physician and her implanting physician were unaware, and could not reasonably have known or have learned through reasonably diligence that they had been exposed to the risks alleged herein and that those risks were the proximate result of Defendant's acts and omissions.

**CAUSES OF ACTION**

**COUNT I:**
**NEGLIGENCE**

58.     All previous paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

59.     Defendant had a duty to individuals, including Plaintiff, to use reasonable care in designing, manufacturing, marketing, labeling, packaging, and selling the Mesh Product.

60.     Defendant was negligent in failing to use reasonable care as described herein in designing, manufacturing, marketing, labeling, packaging, and selling the Mesh Product. Defendant breached its aforementioned duty by, among other things:

a.      Failing to design the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product was implanted, including Plaintiff;

b.   Failing to manufacture the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product was implanted, including Plaintiff;

c.   Failing to use reasonable care in the testing of the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product was implanted, including Plaintiff;

d.   Failing to use reasonable care in inspecting the Mesh Product so as to avoid an unreasonable risk of harm to women in whom the Mesh Product was implanted, including Plaintiff;

e.   Failing to use reasonable care in the training and instruction to physicians for the safe use of the Mesh Product;

f.   Failing to use reasonable care in studying the Mesh Product to evaluate its safety and to determine the nature, magnitude, and frequency of serious, life threatening complications that were known or knowable; and

g.   Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Mesh Product.

61.   The reasons that Defendants' negligence caused the Mesh Product to be unreasonably dangerous and defective include, but are not limited to:

a.   The use of polypropylene material in the Mesh Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b.   The design of the Mesh Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.      Biomechanical issues with the design of the Mesh Product, including, but not limited to, the propensity of the Mesh Product to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d.      The use and design of arms and anchors in the Mesh Product, which, when placed in the women, such as Plaintiff, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e.      The propensity of the Mesh Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f.      The inelasticity of the Mesh Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

g.      The propensity of the Mesh Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h.      The hyper-inflammatory responses to polypropylene leading to problems including chronic pain and fibrotic reaction;

i.      The adverse tissue reactions caused by the polypropylene products, which are causally related to infection, as the polypropylene is a foreign material to the human body;

j.      The harshness of polypropylene upon the female pelvic tissue; and

k.      The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

62.     Defendant also negligently failed to warn or instruct Plaintiff and/or her implanting physician of subjects including, but not limited to, the following:

a.      The Mesh Product's propensities to contract, retract, and/or shrink inside the body;

b.      The Mesh Product's propensities for degradation, fragmentation and/or creep;

c.      The Mesh Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.      The rate and manner of mesh erosion or extrusion;

e.      The risk of chronic inflammation resulting from the Mesh Product;

f.      The risk of chronic infections resulting from the Mesh Product;

g.      The risk of permanent vaginal or pelvic scarring as a result of the Mesh Product;

h.      The risk of recurrent, intractable pelvic pain and other pain resulting from the Mesh Product;

i.      The need for corrective or revision surgery to adjust or remove the Mesh Product;

j.      The severity of complications that could arise as a result of implantation of the Mesh Product;

k.      The hazards associated with the Mesh Product;

l.      The Mesh Product's defects described herein;

m.      Treatment of pelvic organ prolapse and stress urinary incontinence with the Mesh Product is no more effective than practical, safer, available alternatives;

n.      Treatment of pelvic organ prolapse and stress urinary incontinence with the Mesh Product exposes patients to greater risk than practical, safer, available alternatives;

o.      Treatment of pelvic organ prolapse and stress urinary incontinence with the Mesh Product makes future surgical repair more difficult than practical, safer, available alternatives;

p.      Use of the Mesh Product puts the patient at greater risk of requiring additional surgery than practical, safer, available alternatives;

q.      Removal of the Mesh Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.      Complete removal of the Mesh Product may not be possible and may not result in complete resolution of the complications, including pain.

63.     As a direct and proximate result of Defendant's negligence, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

**COUNT II:**
**ALABAMA'S EXTENDED MANUFACTURER LIABILITY DOCTRINE (AEMLD)**
**DESIGN DEFECT**

64.     All previous paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

65.     Plaintiff is an expected user or consumer of the Mesh Product.

66.     The Mesh Product implanted in Plaintiff was conveyed in a condition not contemplated by reasonable persons among those considered expected users or consumers of the Mesh Product.

67.     Safer, practical, and suitable alternatives to the Mesh Product that were available to the Defendant and have existed at the time of manufacture and conveyance that do not present the same frequency or severity of risks as does the Mesh Product. Safer and practical alternatives include but are not limited to, human tissue slings, biological implants, native tissue repair, sutures, slings with less polypropylene, corrective surgery without implanted mesh, and pelvic floor therapy.

68.     The burden of implementing safer, practical, and alternative designs would not have outweighed the reduction of injury caused to consumers, including Plaintiff.

69.     The aforementioned safer, practical, and suitable alternative designs to the Mesh Products were economically and technologically practical and existed at the time the Mesh Products left the Defendant's possession and control.

70.     The Mesh Product implanted in Plaintiff was, at the time conveyed, not in conformity with the generally recognized state of the art applicable to the safety of the Mesh Product at the time it was designed, manufactured, packaged, labeled, and/or sold.

71.     The Mesh Product implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein with respect to its design. As previously stated, the Mesh Product's design defects include, but are not limited to:

a.      The use of polypropylene in the Mesh Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b.    The design of the Mesh Product to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.    Biomechanical issues with the design of the Mesh Product, including, but not limited to, the propensity of the Mesh Product to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d.    The use and design of arms and anchors in the Mesh Product, which, when placed in the women, such as Plaintiff, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e.    The propensity of the Mesh Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f.    The inelasticity of the Mesh Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

g.    The propensity of the Mesh Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h.    The hyper-inflammatory responses to polypropylene leading to problems including chronic pain and fibrotic reaction;

i.  The adverse tissue reactions caused by the polypropylene products, which are causally related to infection, as the polypropylene is a foreign material to the human body.

j.  The harshness of polypropylene upon the female pelvic tissue, and the hardening of the Mesh Product in the body; and

k.  The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

72.   As a direct and proximate result of Defendant's negligence, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

73.   Defendant is strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging, and selling a defective product.

## COUNT III:
## AEMLD-FAILURE TO WARN

74.   All previous paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

75.   The Mesh Product implanted in Plaintiff was not reasonably safe for its intended uses and was defective as described herein as a matter of law due to its lack of appropriate and necessary warnings. Specifically, Defendant did not provide Plaintiff, Plaintiff's implanting

physician, or the medical community with sufficient or adequate warnings regarding, among other subjects:

    a.    The Mesh Product's propensities to contract, retract, and/or shrink inside the body;

    b.    The Mesh Product's propensities for degradation, fragmentation, disintegration and/or creep;

    c.    The Mesh Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

    d.    The rate and manner of mesh erosion or extrusion;

    e.    The risk of chronic inflammation resulting from the Mesh Product;

    f.    The risk of chronic infections resulting from the Mesh Product;

    g.    The risk of permanent vaginal or pelvic scarring as a result of the Mesh Product;

    h.    The risk of recurrent, intractable pelvic pain and other pain resulting from the Mesh Product;

    i.    The need for corrective or revision surgery to adjust or remove the Mesh Product;

    j.    The severity of complications that could arise as a result of implantation of the Mesh Product;

    k.    The hazards associated with the Mesh Product;

    l.    The Mesh Product's defects described herein;

    m.    Treatment of pelvic organ prolapse and stress urinary incontinence with the Mesh Product is no more effective than safer and practical available alternatives;

    n.    Treatment of pelvic organ prolapse and stress urinary incontinence with the Mesh Product exposes patients to greater risk than practical, safer, available alternatives;

o.      Treatment of pelvic organ prolapse and stress urinary incontinence with the Mesh Product makes future surgical repair more difficult than practical, safer, available alternatives;

p.      Use of the Mesh Product puts the patient at greater risk of requiring additional surgery than practical, safer, available alternatives;

q.      Removal of the Mesh Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

r.      Complete removal of the Mesh Product may not be possible and may not result in complete resolution of the complications, including pain; and

s.      The nature, magnitude and frequency of complications that could arise as a result of implantation of the Mesh Product.

76.     As a direct and proximate result of Defendant's failure to provide Plaintiff, Plaintiff's implanting physician, and the medical community with sufficient or adequate warnings, Plaintiff and Plaintiff's healthcare providers were not adequately informed of the potential dangers and/or defects of the Mesh Product.

77.     As a direct and proximate result of the Mesh Product's aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment, including procedures to correct her injuries, and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

78.     Defendant is strictly liable to Plaintiff for designing, manufacturing, marketing, labeling, packaging, and selling a defective product.

## COUNT IV
## NEGLIGENT MISREPRESENTATION

79.     All previous paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

80.     AMS, a for profit company, had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff, and the public that the Mesh Product had not been adequately tested and found to be safe and effective for the treatment of urinary incontinence and pelvic organ prolapse. The representations made by AMS, in fact, were false.

81.     AMS failed to exercise ordinary care in the representations concerning the Mesh Product while AMS was involved in their development, design, manufacture, label, package, distribution, marketing, testing, supply, advertisement, selling, quality assurance, quality control and otherwise engaged in all activities that are part and parcel of the sale and distribution in interstate commerce, because AMS negligently misrepresented the Mesh Product's high risk of unreasonable, dangerous, adverse side effects.

82.     AMS breached their duty in representing that American Medical System,  Inc.'s Mesh Product has no serious side effects different from older generations of similar products and/or procedures to Plaintiff, Plaintiff's physicians, and the medical and healthcare community.

83.     As a foreseeable, direct and proximate result of the negligent misrepresentation of AMS as set forth herein, AMS knew, and had reason to know, that the Mesh Product had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that it created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including mesh erosion, extrusion/protrusion, chronic pain, mesh contraction, infection, abscesses, fistula, inflammation,

scar tissue, organ perforation, dyspareunia, bleeding, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, vaginal scarring, vaginal shrinkage, pelvic floor damage, pelvic pain, urinary and fecal problems, prolapse of organs, and in many cases forcing the need for intensive medical treatment, including but not limited to operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia, injuries to the woman's intimate partner and other severe and personal injuries, which are permanent and lasting in nature.

84.     AMS took unconscionable advantage of their dominant position of knowledge with regard to Plaintiff and the medical providers and engaged in negligent misrepresentations in their relationship with Plaintiff and the medical providers. Plaintiff reasonably and justifiably relied on American Medical Systems Inc.'s misrepresentations.

85.     As a direct and proximate result of American Medical Systems Inc.'s wrongful conduct, including American Medical Systems Inc.'s negligent misrepresentation, Plaintiff has sustained and will continue to sustain severe and debilitating injuries, serious bodily injury, mental and physical pain and suffering, and has incurred economic loss.

## COUNT V:
## BREACH OF IMPLIED WARRANTY

86.     All previous paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

87.     At all relevant and material times, Defendant developed, designed, manufactured, labeled, packaged, distributed, marketed, supplied, advertised, sold and otherwise engaged in all activities that are part and parcel of the sale and distribution of their product, the Pelvic Mesh

Products, representing the quality and effectiveness to health care professionals, the FDA, Plaintiff and the public in such a way as to induce its purchase or use, thereby making an implied warranty that the Defendant's Pelvic Mesh Products would conform to the representations. More specifically, Defendant represented that the Pelvic Mesh Products were safe and effective, that it was safe and effective for use by individuals such as Plaintiff, and/or that it was safe and effective to treat Plaintiff's conditions.

88.    At all relevant times, Defendant intended that the Defendant's Pelvic Mesh Products be implanted for the purposes and be used in the manner that Plaintiff or Plaintiff's implanting physicians in fact used them and Defendant impliedly warranted each product to be of merchantable quality, safe and fit for such use and was not adequately tested.

89.    At all relevant times, Defendant was aware that consumers, including Plaintiff, or Plaintiff's physicians, would implant Defendant's Pelvic Mesh Products in the manner directed by the instructions for use; which is to say that Plaintiff was a foreseeable user of the Defendant Pelvic Mesh Products.

90.    Plaintiff and/or her implanting physicians were at all relevant times in privity with Defendant.

91.    The Mesh Product was expected to reach and did in fact reach consumers, including Plaintiff and her implanting physician, without substantial change in the condition in which it was manufactured and sold by AMS.

92.    At all relevant times, Plaintiff and/or her implanting physicians used the Mesh Product for the purpose and in the manner intended by AMS.

93.    The representations, as set forth above, contained, or constituted affirmations of fact or promises made by the seller to the buyer which related to the good and become part of the

basis of the bargain creating an implied warranty that the good shall conform to the affirmations of fact or promises.

94.     The Mesh Product did not conform to the representations made by Defendant. Defendant breached various implied warranties with respect to the Pelvic Mesh Products including the following particulars:

a.   Defendant represented to Plaintiff and her physicians and healthcare providers through its labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the Mesh Product was safe and effective, when in reality Defendant fraudulently withheld and concealed information about the substantial risks of serious injury and/or death associated with using the Mesh Product;

b.   Defendant represented to Plaintiff and her physicians and healthcare providers that the Mesh Product was as safe, and/or safer than other practical alternative procedures and devices and fraudulently concealed information, which demonstrated that the Mesh Product was not safer than alternatives available on the market; and

c.   Defendant represented to Plaintiff and her physicians and healthcare providers that the Mesh Product was more efficacious than other alternative medications and fraudulently concealed information, regarding the true efficacy of the Mesh Product.

d.   Defendant represented that the Mesh Product would treat and/or cure the conditions that Plaintiff was suffering from; that being urinary incontinence.

95.     In reliance upon Defendant's implied warranty, Plaintiff was implanted with the Mesh Product as prescribed and directed, and therefore in the foreseeable manner normally intended, recommended, promoted and marketed by Defendant.

96.     Defendant made assurances as described herein to the general public, hospitals, and health care professionals that the Mesh Product was safe and reasonably fit for its intended purposes.

97.     At the time of making such implied warranties, Defendant knew or should have known that the Mesh Product did not conform to these representations because the Mesh Product was not safe and has numerous serious side effects, many of which Defendant did not accurately warn about, thus making the Mesh Product unreasonably unsafe for its intended purpose.

98.     Plaintiff and/or her healthcare provider chose the Mesh Product based upon Defendant's warranties and representations as described herein regarding the safety and fitness of the Mesh Product.

99.     Members of the medical community, including physicians and other health care professionals, as well as Plaintiff, individually and/or by and through her physician, and the public, reasonably relied upon Defendant's representations and warranties in connection with the use recommendation, description, and/or dispensing of Defendant Pelvic Mesh Products.

100.    Plaintiff and Plaintiff's physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

101.    Defendant breached these implied warranties because the Mesh Product implanted in Plaintiff was unreasonably dangerous, defective, not of merchantable quality, unsafe, unfit for its intended uses, and inadequately tested as described herein and not at all as Defendant had represented.

102.     Defendant's breach of its implied warranties resulted in the implantation of an unreasonably dangerous and defective product in Plaintiff's body, placing Plaintiff's health and safety in jeopardy.

103.     As a direct and proximate result of Defendant's breach of the aforementioned implied warranties, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

**COUNT VI:**
**PUNITIVE DAMAGES**

104.     All previous paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

105.     Defendant sold the Mesh Product to Plaintiff's healthcare providers and other healthcare providers throughout the United States without doing adequate testing and studying to determine and ensure that the Mesh Product was safe and effective prior to releasing the product for sale for permanent human implantation in the female pelvic area.

106.     Defendant sold the Mesh Product to Plaintiff's healthcare providers and other health care providers throughout the United States in spite of Defendant's knowledge that the Mesh Product can shrink, disintegrate, and/or degrade inside the body, and cause the other problems heretofore set forth in this complaint, thereby causing severe and debilitating injuries suffered by the Plaintiff and numerous other women.

107.     Defendant ignored reports from patients and health care providers throughout the United States and elsewhere of the Mesh Product's failures to perform as intended, which lead to the severe and debilitating injuries suffered by Plaintiff and numerous other women. Rather than

doing adequate testing to determine the cause of these injuries, or to rule out the Product's designs or the processes by which the Products are manufactured as the cause of these injuries, Defendant chose instead to continue to market and sell the Mesh Product as safe and effective.

108.    Defendant knew that the Mesh Product was unreasonably dangerous in light of its risks of failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the Mesh Products, as well as other severe and personal injuries which were permanent and lasting in nature.

109.    Defendant knew and recklessly and/or intentionally withheld material information from the medical community and the public in general, including Plaintiff and Plaintiff's implanting physician regarding the safety and efficacy of the Mesh Product.

110.    Defendant knowingly and recklessly and/or intentionally disregarded the fact that the Mesh Product caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat pelvic organ prolapse and stress urinary incontinence.

111.    Defendant intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries caused by the Mesh Product.

112.    Notwithstanding the foregoing, Defendant continues to aggressively market the Mesh Product to consumers, without disclosing the true risks associated with the Mesh Product.

113.    Defendants knew of the Mesh Product's defective and unreasonably dangerous nature, but continued to manufacture, market, distribute, and sell the Mesh Product so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff.

114.    Defendant continues to conceal and/or fail to disclose to the public, including Plaintiff, the serious complications associated with the use of the Mesh Product to ensure continued and increased sales of the Mesh Product.

115.    Defendant's conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant and request compensatory and punitive damages in an amount exceeding $75,000.00, together with interest, cost of suit, and all such other relief as the Court deems just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

Dated: December 23, 2021

Respectfully submitted,

By:  /s/J.R. Krebs
J.R. Krebs
ASB-3157-K61P
KREBS LAW, LLC
2123 9th St., Suite 110
Tuscaloosa, AL 3540
T: (205) 634-1000
F: (205) 635-2211
jr.krebs@krebslawllc.com

Fatima Abuzerr (*pro hac vice to be submitted*)
MOLL LAW GROUP
22 W Washington Street, 15th Floor
Chicago, IL 60602
T: (312) 462-1700
F: (312) 756-0045
fabuzerr@molllawgroup.com

**COUNSEL FOR PLAINTIFF**